J-S53002-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| M.E.W. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| | : | |
| A.R. | : | |
| | : | |
| Appellant | : | |
| | : | No. 264 MDA 2016 |

Appeal from the Order Entered January 15, 2016 In the
Court of Common Pleas of York County Civil Division at
No(s):  2015-FC-1417-03

BEFORE:  BOWES, SHOGAN, FITZGERALD*, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED AUGUST 16, 2016**

A.R. ("Mother") appeals from the January 15, 2016 order which awarded M.E.W. ("Father") primary physical custody of their four-year-old daughter, B.W.  We affirm.

B.W. was born during September 2011.  Mother and Father were never married.  For the first two years of B.W.'s life, she was cared for primarily by Mother, as Father worked and attended college in the evenings.  After Father graduated, he took on greater responsibility in caring for B.W.

During 2014, Mother began to exhibit paranoid and irrational behaviors, and her relationship with Father became strained.  Specifically, she believed that people were breaking into the parties' home, which prompted Father to purchase a security camera and motion sensors, and to change the locks on the doors.  Mother also became concerned that

_____
*Former Justice specially assigned to the Superior Court.

someone had created a secret blog about her life. Following a Super Bowl party, Mother threatened Father with a hammer and scratched his face, accusing him of responsibility for the blog. After Mother accused Father of sexually abusing B.W., Mother and Father finally separated in July of 2015. The claims were investigated by child protective services, and deemed unfounded.

On July 27, 2015, Father filed a complaint for custody in which he requested sole legal and physical custody of B.W. Father also filed an emergency *ex parte* petition for special relief requesting such custody pending an evidentiary hearing. Father's emergency petition was denied on August 12, 2015. The trial court denied the emergency petition and entered an interim order awarding Mother and Father shared legal and physical custody.

Following the evidentiary hearing, where the trial court considered, *inter alia*, evidence presented by the court-appointed psychologist, Pauline Wallin, Ph.D.; the trial court awarded Father primary physical custody and granted Mother partial physical custody. Specifically, Mother was awarded partial physical custody on alternating weekends from Thursday morning until Sunday at evening. She also exercised partial custody from 9:00 a.m. to 7:00 p.m. on the Thursdays that she did not have weekend custody. The court ordered shared legal custody.

Mother timely filed a notice of appeal on February 12, 2016, together with a concise statement of errors complained of on appeal. She raises the following issues for our review:

A. Whether the trial court abused its discretion in granting primary physical custody to Father, and thus overturning the Interim Order of August 31, 2015, which provided for a fifty (50%) percent shared custody schedule and which both parties testified at trial was working satisfactorily?

B. Whether the trial court abused its discretion in failing to give appropriate weight to the report and testimony of Pauline Wallin, Ph.D[.], [who] both parties presented as an expert and who concluded that either party possessed the mental stability in order to care for the child?

C. Whether the trial court's conclusion that Father was better able to provide stability in the child's education, family life, and community life, . . . was unreasonable as shown by the evidence of record?

Mother's brief at 4.

Initially, we note the following. Mother's first issue is waived because she failed to develop it with any legal argument. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa.Super. 2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa.Super. 2010)) ("where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."). Of the remaining two claims, Mother presents her arguments in the reverse order as the issues are listed in the statement of questions. We address the claims in the order presented in the brief.

We consider Mother's issues mindful of our well-settled standard of review.

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***V.B. v. J.E.B.***, 55 A.3d 1193, 1197 (Pa.Super. 2012) (citations omitted).

"When a trial court orders a form of custody, the best interest of the child is paramount." ***S.W.D. v. S.A.R.***, 96 A.3d 396, 400 (Pa.Super. 2014) (citation omitted). The factors to be considered by a court when awarding custody are set forth at 23 Pa.C.S. § 5328(a).

> **(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> > (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
> >
> > (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

- 4 -

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

Instantly, in its opinion accompanying the subject custody order, the trial court discussed its findings with respect to nearly all of the § 5328(a) factors.[1]  *See* Trial Court Opinion, 1/15/16, at 5-9.  The court found that §§ 5328(a)(2), (4), (5), (9), (10), and (15) weighed in favor of Father to varying degrees, and that none of the factors militated in Mother's favor.  In its supplemental opinion pursuant to Pa.R.A.P. 1925(a)(2)(ii), the court explained that it awarded primary physical custody to Father since he can provide a more stable environment for B.W., and since he is better able to attend to B.W.'s daily needs.  Supplemental Opinion, 3/1/16, at 1.

In her first issue, Mother challenges the trial court's conclusion that Father is more stable and can better provide for B.W.'s needs.  Mother's brief at 13-22.  This argument corresponds with issue "C" in the statement of questions presented.

---

[1] The trial court failed to address § 5328(a)(2.1) in its opinion accompanying the subject custody order.  However, the court discussed Father's alleged abuse of B.W., and B.W.'s involvement with child protective services in its supplemental opinion.  *See* Supplemental Opinion, 3/1/16, at 4.

Mother argues that the trial court abused its discretion in several of its factual findings. First, Mother challenges the trial court's finding that she lives "'between maternal grandfather's house and hotel rooms.'" Mother's brief at 14-16 (quoting Supplemental Opinion, 3/1/16, at 1). Mother asserts that she resides with B.W.'s maternal grandfather, and that she spent time in hotel rooms on only two occasions, as a treat for B.W. *Id*.

Mother's argument fails, as the record does not support her claim that she has stayed in hotel rooms only twice since the separation. During the custody hearing, Mother testified that she is living with B.W.'s maternal grandfather, but that "it's not my home, you know what I'm saying. I like being in my own home. So we would go to a hotel room just to be silly." N.T., 1/8/16, at 145. Mother did not specify how often she stayed in hotel rooms, but indicated she did this "[s]ometimes, not all the time." *Id*. at 218. Given Mother's testimony, it was reasonable for the trial court to infer that Mother stays in hotel rooms somewhat regularly. We discern no abuse of discretion.

Mother next contends that the trial court abused its discretion by concluding that she "'doesn't have any extended family members in this area aside from maternal grandfather.'" Mother's brief at 16-17 (quoting Supplemental Opinion, 3/1/16, at 1). Mother also asserts that the court concluded incorrectly that she and B.W.'s maternal grandfather do not have a close relationship. *Id*.

Mother is correct that B.W.'s maternal grandfather is not the only extended family that she has nearby. Both Mother and Father testified that Mother has a sister, a niece, and the niece's children living in the area. N.T., 1/8/16, at 46, 229. However, it is clear that the trial court's erroneous finding of fact concerning Mother's extended family does not warrant reversal of the subject custody order. The location of Mother's extended family appears to have played, at best, a minimal role in the court's custody decision.

In addition, the record supports the court's finding that Mother does not have a close relationship with B.W.'s maternal grandfather. Mother acknowledged that she and B.W. recently spent Christmas in a hotel room, rather than with B.W.'s maternal grandfather. *Id*. at 219. Mother offered no coherent explanation as to why she would spend Christmas apart from maternal grandfather. Mother stated only that her mother, B.W.'s maternal grandmother, had recently passed away, and that "we were all still kind of mourning in our own ways. . . . I mean, everybody deals with things their own way." *Id*. Thus, the certified record supports the trial court's finding that Mother is not particularly close with maternal grandfather.

Mother also argues that the trial court abused its discretion by faulting her for quitting her job. Mother's brief at 18-19. Mother insists that she will likely go back to school or obtain a new job, and that the trial court made an unwarranted assumption by concluding that she does not have, or will not have, the financial resources necessary to support herself and B.W. *Id*.

We again conclude that Mother is not entitled to relief. Mother testified during the custody proceedings that she resigned from the company where she had worked for twenty years, and that she does not know what she wants to do next. N.T., 1/8/16, 162-64. Mother stated that she may go back to school, but she was undecided on this issue. *Id*. at 163-64. It was proper for the trial court to weigh this testimony against Mother. It is clear that Mother's compulsive decision to quit her job and her inability to plan for her and B.W.'s future indicate that she is less stable than Father.

Finally, Mother argues that the trial court abused its discretion by concluding that she is "'unable to attend to [B.W.'s] medical needs.'" Mother's brief at 19-22 (quoting Supplemental Opinion, 3/1/16, at 2). Mother argues that she was B.W.'s primary caretaker for the first two years of the child's life, and that she is willing and able to schedule medical appointments for B.W., and to take B.W. to those appointments. *Id*.

Father testified during the custody hearing that he has taken B.W. to all of her medical appointments for the previous year and one-half. N.T., 1/8/16, at 90. Father stated that he assumed this responsibility because Mother was "fighting with the one office lady" at B.W.'s pediatrician, and because Mother disliked Father's dental hygienist. *Id*. at 56-57. Father explained, "I started taking [B.W.] to all the appointments to try to avoid all the extra fighting and drama." *Id*. at 57. Father noted that one of B.W.'s recent medical appointments was scheduled during Mother's custody time, and that Mother agreed to take B.W. to the appointment well in advance.

*Id*. at 72. However, when Father sent Mother a text message reminding her of the appointment, Mother requested that the appointment be rescheduled. *Id*. at 72-73.

Mother admitted during her own testimony that she has asked Father to schedule B.W.'s medical appointments during his custody time, and explained, "I don't think that's being unreasonable. I don't think that's being -- and if he has a problem with that, that's something that we need to start talking about more." *Id*. at 203. The trial court questioned Mother concerning her resistance to taking B.W. to medical appointments, and Mother testified as follows.

> THE COURT: Earlier in talking about the appointments for doctors currently, I want to make sure I understood your statement about [Father] scheduling appointments that are on your time versus his time. I hear you, you do not want him to schedule doctor appointments that were during your time?
>
> [Mother]: Honestly, I mean, it really doesn't matter what time that he sets it, but as long as we know. Like, if he wants me to start doing it, I mean, it's something that he does.
>
> THE COURT: Well, then maybe I misunderstood you because I thought the reason you asked it to be rescheduled was because it was on your time, and you wanted him to schedule it on his time.
>
> [Mother]: Yes.
>
> THE COURT: Okay.
>
> [Mother]: But that was just because of that last appointment because, like I said, he didn't give me -- yes, he did tell me in like November, but when the appointment came up, it was just like that day, can you have [B.W.] there.

THE COURT: Did you have a conflict that you couldn't take her?

[Mother]: Yes, it was. I was with my daughter, yes. It wasn't like I was trying to be vindictive. It was like, I was with my daughter.

THE COURT: Okay. So you had no conflict other than being with your daughter?

[Mother]: No, no, no.

N.T., 1/8/16, at 221-22. Accordingly, the record supports the trial court's conclusion that Mother has been unwilling or unable to attend to B.W.'s medical needs. This contention merits no relief.

Mother also argues that the trial court abused its discretion by concluding that she has mental health issues. Mother's brief at 22-24. Mother emphasizes that she was evaluated by Dr. Wallin, who concluded that there was no evidence indicating that she is mentally unstable. *Id*. at 23.

In its opinion accompanying the subject custody order, the trial court found that "no testimony was presented regarding a mental or physical condition of either party that would impair their ability to care for [B.W.]." Trial Court Opinion, 1/15/16, at 9. However, the court explained that it has concerns "regarding Mother's mental health, judgment, and ability to deal with stressful situations." *Id*. During the custody hearing, Father testified extensively concerning Mother's irrational beliefs and actions, including the incident during which Mother threatened Father with a hammer and scratched his face. *See* N.T., 1/8/16, at 60. When asked about the ordeal,

Mother made no effort to refute Father's claim. She described the incident as follows.

Q. Can you tell the Court what happened in that case?

A. Toward the end of our relationship, it was a lot of arguments. It was just not a cohesive situation.

Q. What would you argue over?

A. Like he said, like, you know, I felt like things was going on that he wasn't being truthful to me about. I felt like being safe in my home, that was being questioned. I was not feeling safe in my own home. I don't think that's cool at all. So that's why we got the cameras and things of that nature. So it was all that going on. It just wasn't a cohesive environment because when you're telling your man, I'm feeling this, this, and this, and they're not believing you, of course. And [Father] is very passive aggressive. So I'm like, going this, this, and this, and he not trying to have no discussion, so of course that's going to make me want to --

Q. Did you go at him with a hammer?

A. Yes, I did. I'm not going to lie, yes, I did.

Q. Did you hit him?

A. No, I didn't. I wasn't going to hit him with a hammer.

Q. Did you threaten to hit him?

A. No. I think it was -- I was talking to him with the hammer in my hand, but I don't think I threatened him. But I was just saying what I had to say with the hammer in my hand. I was only threatening. I was like, oh, I'm going to knock you in the head with a hammer.

Q. Why would you have a hammer in your hand?

A. It just happened because, I mean, like I said, to always keep going to somebody with your concerns and they're not believing

- 12 -

you and they're not even having a one-on-one conversation because they're not believing you, that was just getting on my nerves. So maybe it was more so like, I am just so sick and tired kind of situation. So that's kind of where it went to at that point for me.

Q. So is it an accurate situation to say that you clawed him?

A. Yes, I did.

*Id*. at 168-70.

Thus, while Mother is correct that Dr. Wallin concluded that she did not suffer from a diagnosed mental illness, the certified record confirms that Mother has a history of engaging in paranoid and violent conduct. As it was appropriate for the trial court to consider Mother's behavior in rendering its best-interest determination, Mother's claim fails.

For all of the foregoing reasons, we conclude that the trial court did not abuse its discretion by awarding Father primary physical of B.W. and granting Mother periods of partial physical custody.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/16/2016

- 13 -